## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| FRANK G. HOLLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:16-CV-195-WKW |
| | ) | [WO] |
| TOWN OF CAMP HILL; DANNY | ) | |
| EVANS; and JOHNNY L. POTTS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Camp Hill, Alabama, is a town of about 1,000 people. Local government in a town that tiny always requires the same small group of people to interact over and over again. That can lead to friendships . . . or hostility.

Frank Holley and Danny Evans were frequent foes in Camp Hill politics. In 2015, Evans was the mayor of Camp Hill and a recurring target of Holley's criticism. In retaliation, says Holley, Evans told Chief of Police Johnny Potts to arrest Holley. And one day, when Holley was driving into town, Potts did indeed stop and arrest Holley. Holley pleaded guilty to making an improper lane change, but he also filed this lawsuit for First Amendment retaliation.

Because Holley pleaded guilty to a traffic violation, the court must assume that Potts had probable cause to stop and arrest him. *Wood v. Kessler*, 323 F.3d 872, 880 n.10 (11th Cir. 2003). And once Potts stopped Holley, he also had probable

cause to arrest him for other offenses.  Evans and Potts are thus entitled to qualified immunity.  But under the Supreme Court's recent decision in *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018), Holley can still sue the Town of Camp Hill for First Amendment retaliation.

Defendants' motion for summary judgment is therefore due to be granted in part and denied in part.  The Recommendation of the Magistrate Judge is due to be adopted in part, modified in part, and rejected in part.

## I.  JURISDICTION AND VENUE

The court has federal question subject-matter jurisdiction over Holley's First Amendment retaliation claim, 28 U.S.C. §§ 1331, 1343, and exercises supplemental jurisdiction over his state-law tort claim, *id.* § 1367(a).  The parties do not dispute personal jurisdiction.  Venue is proper.  *Id.* § 1391(b).

## II.  STANDARDS OF REVIEW

To prevail on summary judgment, Defendants must show that there is "no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  (*See* Doc. # 44, at 2–4.)

The Magistrate Judge filed a Recommendation on Defendants' motion for summary judgment.  (Doc. # 44.)  The court reviews disputed portions of that Recommendation *de novo*.  28 U.S.C. § 636(b).  It may accept, reject, or modify the Recommendation.  Fed. R. Civ. P. 72(b)(3).

## III. FACTS

Camp Hill is a small, incorporated town in Tallapoosa County.[1]  Just 1,014 people lived there in 2010.[2]  Like other small towns, Camp Hill is governed by a mayor and town council.  Ala. Code §§ 11-40-12(a), 11-44F-3.  The council is Camp Hill's legislative body.  *Id.* § 11-43-43.  The mayor is the town's "chief executive officer," and he or she has "general supervision and control of all other officers and the affairs of the . . . town."  *Id.* § 11-43-81.

Frank Holley and Danny Evans have both been the mayor of Camp Hill. Holley has served four terms, and Evans has twice defeated Holley in mayoral elections.  (Doc. # 31-2, at 4, 12.)  Evans was the mayor in 2015.  At the same time, Holley remained politically active and often attended town council meetings.  He publicly questioned Evans's mayoral salary, the lack of a recent town audit, and Camp Hill's financial condition.  (Doc. # 31-2, at 9–12; Doc. # 31-5, at 2–3.)  The minutes of an August 2015 town council meeting reflect the contentious nature of Holley and Evans's relationship:

> Mr. Frank Holley was present and addressed Mayor Evans asking why he wasn't allowed to speak at the last Council Meeting.  Mr. Holley then asked Mayor Evans to resign or Council to impeach him. There was no response.  Holley said he was denied public records when requested.  Mr. Holley asked Mayor Evans if he was getting paid more

---

[1]  An Act to incorporate the town of Camp Hill, No. 395, 1894–95 Ala. Laws 740 (1895).

[2]  U.S. Census Bureau, *Alabama: 2010 Summary Population and Housing Characteristics* 32 (Dec. 2012); *see* 1 U.S. Dep't of Commerce, *1970 Census of Population: Characteristics of the Population*, pt. A, § 1, at 2-11 (May 1972) (reporting a population of 1,554).

> than $800.00 per month. Mayor Evans replied "no." Mayor Evans also
> said to Mr. Holley that he was tired of him (Holley) coming to Council
> Meetings intimidating him. Mr. Holley asked Mayor Evans if he felt
> intimidated. Mayor Evans replied "Yes, I feel intimidated by you."

(Doc. # 31-6, at 1; *see* Doc. # 31-5, at 3.) Of course, both men deny that they saw

each other as rivals. (Doc. # 31-2, at 11; Doc. # 35-1, at 6–8.) But neither were they

allies, and Evans allegedly used the police to retaliate against Holley.

**A.** **Evans allegedly ordered police officers to arrest Holley in retaliation for Holley's protected speech.**

Holley has repeatedly alleged that Evans directed Camp Hill police officers

to "target" or "profile" him. "This [profiling] is no surprise," Holley wrote to Evans

in September 2015, "because of my addressing important and sensitive issues at

council meetings which has drawn attention to your incompetency, and your

inability to compete intellectually." (Doc. # 31-3, at 1.)

According to witnesses, in 2014 Evans told police officers to target Holley.

Roosevelt Finley, who was the police chief in 2014, says that Evans repeatedly

ordered him "to arrest [Holley] on illegal charges, whether it be for DUI or whatever

because of his [constant] meddling in Camp Hill affairs." (Doc. # 31-7, at 1; *see*

Doc. # 31-10, at 5.) Finley also testified that Evans told him to "set [Holley] up"

and to do "anything you can do to arrest that b—ard, put his old a— in jail." (Doc.

# 31-10, at 4.) Once, when Finley told Evans there was no probable cause to arrest

Holley, Evans allegedly responded: "Well, you should arrest him for something."

(Doc. # 31-10, at 3.)

A former Camp Hill police officer, Nathan White, likewise testified that Evans told him to arrest Holley for driving under the influence even though Holley was "completely sober." (Doc. # 31-8, at 1; Doc. # 31-11, at 2–3.)

And in an affidavit, Camp Hill resident Morris Greathouse says he overheard Evans tell Johnny Potts "to arrest Mr. Frank Holley . . . because [he] drove around Camp Hill drunk all the time." (Doc. # 31-9, at 1.)[3] According to Greathouse, Evans also told Potts that "he had already ordered Chief Roosevelt Finley to arrest that d— Frank Holley because he could not stand that Mother F—er." (Doc. # 31-9, at 1.)

Evans allegedly targeted other people too. According to Greathouse, Evans told Potts to target a man named Hubert Finley. Potts then arrested Hubert. (Doc. # 31-9, at 1.) Roosevelt Finley also testified that Evans told him to "target" Douglas Heard. (Doc. # 31-10, at 2.) Douglas Heard claims Potts arrested him "without probable cause as directed by Danny Evans." (Doc. # 31-16, at 2.)

In response to Holley's allegations, Evans testifies that he "never ordered anybody to be arrested." (Doc. # 35-1, at 5.) No one admits ever arresting Holley, Hubert Finely, or Douglas Heard without probable cause. In the ten years before Holley's arrest, "the Town of Camp Hill never had a legal finding against it that anyone in the police department or any other public official violated the First

---

[3] In 2014, Potts was an officer in the police department. He was the police chief in 2015.

Amendment rights of any citizen." (Doc. # 27-3, at 2.) And in that same decade, Camp Hill "never received any complaints [other than those from Holley] that a mayor, chief of police or any other public official attempted to violate the constitutional right of any citizen to free speech." (Doc. # 27-3, at 3.)

**B.** **Potts arrested Holley, who pleaded guilty to a traffic violation.**

According to Holley, Evans's "targeting" culminated on December 14, 2015. Holley had gone to Dadeville to buy a bottle of liquor. He was driving back into Camp Hill when Johnny Potts, who was then the chief of police, pulled him over. (Doc. # 27-1, at 4.) According to Potts, Holley had been driving "unusually slowly" and was weaving between the center lane line and the side of the road. Potts claims he suspected Holley of drunk driving. (Doc. # 27-2, at 3–4.) But Holley maintains that he used his turn signal, drove just under the speed limit, and otherwise obeyed the law. He denies that the road even had a center lane line. (Doc. # 27-1, at 4; Doc. # 31-2, at 14–16.)

Once Holley pulled over, Potts got out of his cruiser and walked up to Holley's truck.[4] Within seconds, Potts noticed a .38 pistol on the bench seat next to Holley. Potts asked if Holley had a pistol permit. Holley replied that he did not have a permit but that he had a "permission card" from the sheriff of Tallapoosa County. (*See* Doc.

---

[4] Potts's "body cam" recorded a video of the traffic stop. (Exhibit C-1.) The video does not show why Potts stopped Holley, but it does establish what happened during the stop and arrest. *Cf. Scott v. Harris*, 550 U.S. 372, 380 (2007).

# 31-2, at 14.)[5] Potts then asked if Holley had been drinking, stating that Holley had been "all over the white line."

Less than two minutes after first talking to Holley, Potts announced he was going to conduct a field sobriety test. The test consisted of Potts asking Holley to touch his nose with each hand and to stand on one foot. Holley touched his nose with his left hand, but he had trouble doing so with his right. (Before the test, he told Potts he had just had surgery on his right shoulder.) Holley was shaky while standing on one foot. Potts then arrested Holley "for driving under the influence of alcoholic beverages." Holley was in handcuffs about three minutes into the stop. Potts took Holley's pistol from the truck and put it in his cruiser. Potts explained that he did not want anyone to steal the "high-dollar weapon." Holley denied drinking alcohol.

Potts then drove Holley to jail, where a blood alcohol test revealed that Holley had no alcohol in his system whatsoever. (Doc. # 27-2, at 3.) Later that night, Potts charged Holley with making an illegal lane change and carrying a pistol without a permit. (Doc. # 31-14, at 2; Doc. # 31-15, at 2.) On his attorney's advice, Holley eventually pleaded guilty to the lane violation. (Doc. # 31-15, at 1; Doc. # 31-17, at 1.) In exchange, Camp Hill dismissed the weapons charge. (Doc. # 31-14, at 1.)

---

[5] In his deposition, Holley referred to it as a "commission card." (Doc. # 27-1, at 6.) Holley says he later learned the card was not a valid permit. (Doc. # 27-1, at 7.)

**C.** **The Magistrate Judge recommended denying Defendants' motion for summary judgment.**

After pleading guilty, Holley sued Evans, Potts, and the Town of Camp Hill for First Amendment retaliation and for "negligence or wantonness." (Doc. # 1.) Defendants moved for summary judgment. (Doc. # 27.) They argue Holley's guilty plea bars him from challenging whether Potts had probable cause. If Potts had probable cause, Defendants continue, there can be no constitutional violation. Finally, they argue the state-agent immunity doctrine defeats Holley's tort claim.

The Recommendation of the Magistrate Judge concluded that Holley's First Amendment claim should survive summary judgment because Holley is not barred from challenging the existence of probable cause and because Defendants are not entitled to qualified immunity. (Doc. # 44, at 6–13.) Defendants objected to that conclusion. (Doc. # 45.) The Recommendation also concluded that Holley's tort claim should be dismissed because of the state-agent immunity doctrine. (Doc. # 44, at 13–14.) Holley did *not* object to that conclusion. (*See generally* Doc. # 46.)

## IV. DISCUSSION

Holley's First Amendment claim raises three questions. First, does his guilty plea for making an improper lane change collaterally estop him from challenging whether Potts had probable cause? Second, if Potts had probable cause, are Evans and Potts entitled to qualified immunity? And third, if Potts had probable cause, can Holley still sue the Town of Camp Hill? Answers: yes, yes, and yes.

**A.** **The doctrine of collateral estoppel bars Holley from claiming that he was stopped without probable cause.**

When Holley pleaded guilty to making an illegal lane change, he necessarily admitted that he made an illegal lane change. But now Holley says he committed no traffic violations whatsoever. That argument implicates the doctrine of collateral estoppel (also known as "issue preclusion"), which generally keeps parties from relitigating issues already decided in court. *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1263 (11th Cir. 2011). Because Holley pleaded guilty in an Alabama court, Alabama law determines whether he is collaterally estopped from arguing that he did not make an illegal lane change. *Id.* He is barred from making that argument.

> **1.** *Alabama's collateral estoppel doctrine extends to situations in which a party to one case is in privity with a party to an earlier case.*

The Alabama Supreme Court often summarizes the collateral estoppel doctrine in a four-part boilerplate test:

> For the doctrine of collateral estoppel to apply, the following elements must be established: (1) that an issue in a prior action was identical to the issue litigated in the present action; (2) that the issue was actually litigated in the prior action; (3) that resolution of the issue was necessary to the prior judgment; and (4) that the same parties are involved in the two actions.

*Walker v. City of Huntsville*, 62 So. 3d 474, 487 (Ala. 2010) (cleaned up); *see also, e.g.*, *Stinnett v. Kennedy*, 232 So. 3d 202, 220 (Ala. 2016). This formulation can be helpful, especially for the first three elements. But the fourth element, which is often called the "mutuality of estoppel" requirement, *Ex parte Flexible Prods. Co.*, 915

So. 2d 34, 45 (Ala. 2005), is somewhat misleading.

The parties do not dispute that the first three elements of the test are satisfied. Nor could they. Holley made a knowing and voluntary guilty plea in state court, and there is no indication that he preserved any issues for appeal. So as a matter of state law, Holley admitted he made an improper lane change, and he waived any challenges to the legality of his arrest. *See G.E.G. v. State*, 54 So. 3d 949, 956 (Ala. 2010); *Vann v. State*, 214 So. 2d 925, 926 (Ala. Ct. App. 1968). Determining that Holley made an improper lane change was necessary to his conviction. It is the same issue now before the court.

So if collateral estoppel does not apply, it must be because there is no mutuality of estoppel. That is what the Magistrate Judge concluded. The Magistrate Judge wrote that Holley pleaded guilty in a case brought by the State of Alabama,[6] and Alabama is not a defendant here.[7] Because "the same parties" are not involved in both cases, the Magistrate Judge reasoned, collateral estoppel cannot apply.

On a strict reading of the boilerplate collateral estoppel test, the Magistrate Judge would be correct. But that test is misleading. The Alabama Supreme Court

---

[6] This fact is not entirely clear from the record. Holley pleaded guilty in an Alabama state court, but the traffic ticket says Holley violated "Municipal Ordinance No. 247." (Doc. # 31-15, at 2.) The complaint does the same thing, and it also has a checked box next to the words "Municipality of" in the case caption. (Doc. # 31-14, at 2.) But the court construes the facts in the light most favorable to Holley and assumes the state was a party in the earlier case.

[7] Camp Hill is a political subdivision of the State of Alabama, but it is a distinct entity from the state. *See Jernigan v. City of Eufaula*, 123 F. Supp. 3d 1322, 1328 (M.D. Ala. 2015).

does not "strictly enforce[]" the mutuality requirement "if the party raising the defense of collateral estoppel . . . is in privity with a party to the prior action." *Dairyland Ins. Co. v. Jackson*, 566 So. 2d 723, 726 (Ala. 1990). In other words, "the doctrine of mutuality of estoppel may be satisfied by less than a perfect identity of the parties in the first and second actions, as when particular parties are in privity." *Flexible Prods.*, 915 So. 2d at 48.

Privity is a "flexible" term that generally applies when one person has the "same interests" as another. *Jim Parker Bldg. Co. v. G & S Glass & Supply Co.*, 69 So. 3d 124, 132 (Ala. 2011) (quoting *EEOC v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1286 (11th Cir. 2004)); *see Dairyland*, 566 So. 2d at 726 ("The test for determining if two parties are in privity focuses on identity of interest."). Whether privity exists "has generally been resolved on an ad hoc basis in which the circumstances determine whether a person should be bound by or entitled to the benefits of a judgment." *Stewart v. Brinley*, 902 So. 2d 1, 11 (Ala. 2004) (cleaned up); *see Hughes v. Martin*, 533 So. 2d 188, 191 (Ala. 1988). In other words, there is no bright-line rule. Courts must instead look at the facts of the case and the interests of everyone involved. Under the right circumstances, two people might be in privity if both were "involved" in an earlier case, even if one person had not been a party to it. *Biles v. Sullivan*, 793 So. 2d 708, 712–13 (Ala. 2000); *see Flexible Prods.*, 915 So. 2d at 48.

## 2. *Under binding Eleventh Circuit precedent, Potts is in privity with the State of Alabama.*

The Eleventh Circuit applied these principles in *Wood v. Kessler*, 323 F.3d 872 (11th Cir. 2003). Under that decision, the court must find that Potts is in privity with the State of Alabama.

In *Wood*, Alabama State Trooper Michael Kessler gave Melvin Wood a ticket for driving 62 mph in a 45 mph zone. *Id.* at 875. Months later, a prosecutor told Kessler to give Wood a citation for reckless driving, too. Kessler backdated the second citation and arrested Wood. A court found Wood guilty of speeding but not guilty of reckless driving. *Id.* at 876. Wood then sued Kessler for false arrest. *Id.* at 876–77.

The Eleventh Circuit held that because Wood was driving 17 mph over the limit, Kessler had probable cause to believe Wood was driving recklessly. It treated Wood's speeding as an "established fact" because his "conviction for driving at 62 mph in a 45 mph zone collaterally [estopped] him from relitigating the fact of his speeding in [a] § 1983 case." *Id.* at 879. The court addressed the fact that "Trooper Kessler was not a party in the prior case." *Id.* at 880 n.10. It held that because "Kessler acted for the State in charging Wood with speeding in the prior case," and because Kessler shared "an identity of interest with the State in the subject matter of the litigation," collateral estoppel applied. *Id.*

Though *Wood* is an Eleventh Circuit decision, not an Alabama Supreme Court

case, *Wood* applied and interpreted Alabama law. As a result, *Wood* "should be followed . . . absent a subsequent state court decision or statutory amendment which makes [it] clearly wrong." *Lee v. Frozen Food Express, Inc.*, 592 F.2d 271, 272 (5th Cir. 1979) (per curiam). Holley cites no Alabama statute or court decision that makes the holding in *Wood* "clearly wrong." Nor has the court found any. So under *Wood*, Potts is in privity with the State of Alabama. Potts "acted for the State in charging" Holley with making an improper lane change, and Potts "shares an identity of interest with the State" in Holley's conviction. *Wood*, 323 F.3d at 880 n.10.

As a result, the court must assume that Holley made an illegal lane change. That means Potts had probable cause for a traffic stop. *See United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008). Alabama's collateral estoppel doctrine thus prevents Holley from challenging whether Potts had probable cause for a traffic stop.[8] To the extent the Magistrate Judge concluded that collateral estoppel does not apply here, the Recommendation is due to be rejected.

---

[8] Other courts have reached similar conclusions applying Alabama law. *See Roberts v. Fannin*, No. 17-CV-489, 2018 WL 1163891, at *4 (N.D. Ala. Jan. 30, 2018) ("Because the plaintiff's guilty plea waived his claim that there was no probable cause for his arrest, this court must accept the plaintiff's conviction under Alabama law."); *Gaddis v. Ledbetter*, No. 16-CV-1972, 2017 WL 3841935, at *3 (N.D. Ala. Aug. 4, 2017) (same); *Russell v. Hendrix*, No. 16-CV-174, 2017 WL 4477277, at *3 (S.D. Ala. Oct. 6, 2017) ("To the extent the preclusive effect of a conviction based on a guilty plea depends on whether the state of conviction would recognize it as legally establishing probable cause, it seems clear that Alabama would do so.") (cleaned up); *Acosta v. McNeill*, No. 13-CV-309, 2013 WL 5770736, at *3 (M.D. Ala. Oct. 24, 2013) (holding a plaintiff's guilty plea established probable cause for his arrest).

**B.** **Because Potts had probable cause to stop Holley, both Potts and Evans are entitled to qualified immunity.**

Holley argues that he was stopped and arrested in retaliation for exercising his First Amendment rights. But because he sued Evans and Potts in their individual capacities, he must establish more than a constitutional violation.[9] He must also show that when Potts stopped and arrested Holley, every reasonable officer would have known that the stop and arrest were unconstitutional. *See Manners v. Cannella*, 891 F.3d 959, 968 (11th Cir. 2018). Holley has not met that burden.

Because Potts had probable cause to stop Holley for making an illegal lane change, he also had probable cause to arrest Holley for that offense. *See* Ala. Code § 15-10-3(a)(1); *Stephens v. DeGiovanni*, 852 F.3d 1298, 1320 n.21 (11th Cir. 2017) ("A custodial arrest may be made for misdemeanor offenses and traffic violations."); *Lee v. Ferraro*, 284 F.3d 1188, 1194–95 (11th Cir. 2002). And based on undisputed facts — including Potts's "body cam" footage — a reasonable officer could have also concluded that there was at least arguable probable cause to arrest Holley on suspicion of drunk driving and for carrying a pistol without a permit.

Of course, Holley maintains that Potts lacked probable cause for an arrest, and he disputes Potts's motivations. But qualified immunity is not concerned with

_____

[9] Holley does not specify whether he is suing Evans and Potts in their official capacities, their individual capacities, or both. (*See* Doc. # 1.) But because Holley seeks punitive damages, and because Evans and Potts assert qualified immunity as a defense, the court finds that Holley did not sue Evans and Potts in their official capacities. *Fleming v. Dowdell*, 434 F. Supp. 2d 1138, 1146 n.6 (M.D. Ala. 2005), *aff'd*, 182 F. App'x 946 (11th Cir. 2006) (per curiam).

Potts's subjective intent or beliefs. *See Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010) (citing *Rupshing v. Parker*, 599 F.3d 1263, 1266 (11th Cir. 2010)). The question is whether a reasonable officer in Potts's position could have believed that he or she had probable cause to arrest Holley. *See Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997). It is also irrelevant that Potts did not tell Holley he was being arrested for a traffic or weapons violation. "Quite simply, the validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." *Lee*, 284 F.3d at 1195–96 (cleaned up).

Holley admitted to Potts that he did not have a permit for the .38 revolver in his truck. (*See* Doc. # 31-2, at 14.) It is a misdemeanor to carry a pistol in a vehicle without a permit, unless the pistol is unloaded and locked away out of reach. Ala. Code §§ 13A-11-73, 13A-11-84(a). Holley had a "permission" or "commission card" from the Tallapoosa County Sheriff, but that did not satisfy the permit requirement. Thus, Holley confessed to a misdemeanor, meaning Potts had probable cause to arrest Holley.

Holley also made an illegal lane change and had some trouble completing the field sobriety test. In the video of the traffic stop, Holley's speech arguably sounds slurred. Holley also appears confused when Potts asks for his license and proof of insurance. Thus, a reasonable officer could have concluded that Holley was driving under the influence of alcohol in violation of state law. Ala. Code § 32-5A-191(a).

That means Potts had at least arguable probable cause to arrest Holley.

Because Potts had probable cause to stop Holley for an illegal lane change and at least arguable probable cause to arrest him for other offenses, Potts and Evans are entitled to qualified immunity. It was not clearly established in December 2015 that an arrest supported by probable cause could violate the First Amendment. In 2012, the Supreme Court wrote that it had "never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause." *Reichle v. Howards*, 566 U.S. 658, 664–65 (2012). And just this year, the Eleventh Circuit held that arguable probable cause defeated a First Amendment claim. *Gates v. Khokhar*, 884 F.3d 1290, 1297–98 (11th Cir. 2018). Those cases shield Potts from liability. And if Potts had probable cause or arguable probable cause, then Evans cannot be liable for an arrest made without probable cause or arguable probable cause.

The upshot is that both Evans and Potts are entitled to qualified immunity. To the extent the Magistrate Judge concluded otherwise, the Recommendation is due to be rejected.

**C.      Holley can still maintain a claim against the Town of Camp Hill thanks to recent Supreme Court precedent.**

Because Potts had probable cause to stop and arrest Holley, Evans and Potts are entitled to summary judgment. Until recently, that reasoning would have been enough to keep Holley from suing Camp Hill, too. *See Dahl v. Holley*, 312 F.3d

1228, 1236 (11th Cir. 2002). But the Supreme Court's recent decision in *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018), set forth a new rule for First Amendment retaliation claims.[10] Because of *Lozman*, and because Camp Hill is not entitled to qualified immunity, *Moore v. Morgan*, 922 F.2d 1553, 1556 (11th Cir. 1991), Holley's claim against Camp Hill may proceed.

### 1. Lozman v. City of Riviera Beach *permits certain First Amendment retaliation suits even if the police had probable cause.*

Fane Lozman was a frequent critic of the City of Riviera Beach, Florida. At one city council meeting, Lozman refused to leave the podium, so a councilman told the police to arrest him. 138 S. Ct. at 1949–50. Lozman conceded that the police had probable cause to arrest him, but he maintained that "the City, through its city councilmembers, [had] formed an official policy to retaliate against him and ordered his arrest." *Id.* at 1951. He supported his claim by pointing to minutes of a closed-door city council meeting in which the city supposedly "formed an official plan to intimidate him." *Id.* at 1949.

The Eleventh Circuit held that because there was probable cause to arrest Lozman, the city could not have violated the First Amendment. *Lozman v. City of Riviera Beach*, 681 F. App'x 746, 750–52 (11th Cir. 2017) (per curiam). But the Supreme Court held that Lozman could maintain his claim. 138 S. Ct. at 1955.

---

[10] The Magistrate Judge did not have the benefit of *Lozman*, which was decided a few weeks after the Recommendation was filed.

"An official retaliatory policy," the Supreme Court explained, "is a particularly troubling and potent form of retaliation." *Id.* at 1954. Citizens may address a rogue officer's retaliatory actions through administrative channels. *Id.* But "when the government itself orchestrates the retaliation," citizens may have "little practical recourse." *Id.* And because political speech is "high in the hierarchy of First Amendment values," the ability to sue for retaliation against political speech is particularly important. *Id.* at 1955.

The Supreme Court rejected the idea that letting Lozman sue would open the floodgates of First Amendment retaliation lawsuits. Because Lozman sued a municipality, not individuals, he could only prevail if he presented "objective evidence of a policy motivated by retaliation." *Id.* at 1954. The Court stated that the city could rebut Lozman's claim by showing it would have arrested him even absent a retaliatory motive. *Id.* at 1955 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). But still, it gave Lozman the right to sue.

### 2. *Like the plaintiff in* **Lozman***, Holley has evidence of an official policy of retaliation.*

*Lozman*'s requirement of a "policy motivated by retaliation" echoes the basic rule from *Monell v. Department of Social Services*: a town "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." 436 U.S. 658, 694 (1978). "Instead, it is when execution of a government's *policy or custom*, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* (emphasis added); *see Grech v. Clayton Cty.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc).

Camp Hill argues that Holley has not shown a policy or custom of retaliation. (Doc. # 27, at 21; Doc. # 34, at 8–9; Doc. # 45, at 7–8.) But Camp Hill fails to establish that it is entitled to summary judgment on this issue. Evans was the mayor of Camp Hill, so he could have been a policymaker for Camp Hill on at least some police matters. And if he was a policymaker, Camp Hill could be liable if he ordered a retaliatory arrest.

### a.  Municipalities can be liable for a policymaker's actions.

Camp Hill cannot be liable simply because one of its employees violated the Constitution. If, for example, a rank-and-file police officer used excessive force on Holley, Camp Hill could be liable only if that use of force followed an "officially promulgated policy" or an "unofficial custom or practice." *Grech*, 335 F.3d at 1329. Most towns are not foolish enough to have an officially promulgated policy of using excessive force, so the "custom or practice" rule would be key. But a "custom" must be "so pervasive as to be the functional equivalent of a formal policy." *Id.* at 1330 n.6. Otherwise, there would be respondeat superior liability. To keep that from happening, the court would have to look for "the repeated acts of a final policymaker" who acquiesced in the use of excessive force. *Id.* at 1329. So in an

excessive force case involving a rank-and-file officer, Holley would likely have to show that a town policymaker both knew that officers routinely used excessive force and refused to do anything about it. *See Ludaway v. City of Jacksonville*, 245 F. App'x 949, 951 (11th Cir. 2007); *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005); *White v. City of Birmingham*, 96 F. Supp. 3d 1260, 1282–84 (N.D. Ala. 2015).[11]

Camp Hill relies on this line of cases, arguing that because Holley does not identify more than one arrest in violation of the First Amendment, Camp Hill cannot be liable. But there is an important difference between a low-level town employee's actions and a town policymaker's actions. As a corporate entity, Camp Hill can act only through natural persons. And as the Supreme Court explained in *Pembaur v. City of Cincinnati*, if an action "is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." 475 U.S. 469, 481 (1986); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion) ("We have assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business.").

So if Evans is a policymaker who ordered an unconstitutional arrest, Camp

---

[11] Camp Hill quotes three paragraphs from *White* without citing it. (Doc. # 27, at 19–20.)

Hill is liable for that single retaliatory arrest. *See Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404–05 (1997); *Cooper v. Dillon*, 403 F.3d 1208, 1222 (11th Cir. 2005) (holding a police chief liable in his official capacity because he enforced a facially unconstitutional state statute one time against one person); *cf. Lozman*, 138 S. Ct. at 1955 (not discussing or requiring evidence of multiple retaliatory arrests).

### b. Evans might be a policymaker for law enforcement purposes, so Camp Hill might be liable.

By definition, a policymaker's decisions need no approval to have legal effect, and they cannot be reversed by another town body. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir. 2004); *see Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 638 (11th Cir. 1991) (holding a mayor was not a policymaker on zoning matters when the city council could override his decisions). Towns "often spread policymaking authority among various officers and official bodies." *Pembaur*, 475 U.S. at 483 (plurality opinion). Whether someone is a policymaker is a question of state law. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Statutes, ordinances, and regulations are thus relevant considerations. But so are "custom or usage having the force of law." *Id.* (cleaned up). If, as a practical matter, a local body has the authority to review a decision but no actual opportunity to exercise meaningful review, the person who made the decision is a policymaker. *Holloman*, 370 F.3d at 1292; *see Templeton v. Bessemer Water Serv.*, 154 F. App'x 759, 766 (11th Cir. 2005) (holding evidence of "*de facto* control" meant a mayor

was a policymaker for the local water service).

Is Evans a policymaker? Maybe. If Evans could order arrests, and if the town council could not meaningfully review those orders, then Evans was a policymaker for at least some police matters. There is evidence Evans had that authority. As mayor, Evans was Camp Hill's chief executive officer. Ala. Code § 11-43-81. He had "general supervision and control" over Camp Hill's officers and affairs. *Id.* According to witnesses, he repeatedly ordered police officers to arrest people. Roosevelt Finley and Nathan White said they disobeyed those orders because there was no probable cause for an arrest, but they did not say Evans lacked authority to order arrests. Morris Greathouse says that he heard Evans order arrests. Based on this and other evidence, a reasonable juror could find that Evans ordered Potts to arrest Holley in retaliation for Holley's political speech.

If Evans was a policymaker in law enforcement matters, then Camp Hill could be liable for his policies. Camp Hill has not met its burden of showing that it is entitled to summary judgment on this issue. The Magistrate Judge reached that conclusion for different reasons, so the Recommendation is due to be modified to reflect the reasoning above.

**D.** **The Magistrate Judge properly dismissed Holley's state-law claim.**

The Magistrate Judge recommends dismissing Holley's state-law tort claim. (Doc. # 44, at 13–15.) Holley did not object to that portion of the Recommendation.

(*See generally* Doc. #46.)  After independently reviewing the record and considering the Recommendation, the court adopts the Recommendation of the Magistrate Judge on this issue.  Alabama law entitles Defendants to immunity.  *See* Ala. Code § 6-5-338(a); *Ex parte Harris*, 216 So. 3d 1201 (Ala. 2016).

## V.  CONCLUSION

For the reasons above, it is ORDRED that:

1.     The Recommendation of the Magistrate Judge (Doc. #44) is REJECTED in part, MODIFIED in part, and ADOPTED in part;

2.     Defendants' objections (Doc. #45) are OVERRULED in part and SUSTAINED in part;

3.     The Motion for Summary Judgment (Doc. #27) is GRANTED on each of Plaintiff's claims against Defendants Evans and Potts;

4.     The Motion for Summary Judgment (Doc. #27) is GRANTED on Plaintiff's state-law claim against the Town of Camp Hill;

5.     The Motion for Summary Judgment (Doc. #27) is DENIED on Plaintiff's § 1983 claim against the Town of Camp Hill; and

6.     The motion for a status conference (Doc. #49) is DENIED.

DONE this 29th day of October, 2018.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE